## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | |
|---|---|
| JOHN GRAY III, individually and as personal representative of the Estate of J.G., a deceased minor, and ELISABETH GRAY, | 9:25-cv-03174-DCN<br><br>C/A No.: _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| FISHER-PRICE, INC., a Delaware corporation, and MATTEL, INC., a Delaware corporation, | |
| Defendants. | |

## <u>CIVIL ACTION COMPLAINT</u>

Plaintiffs John Gray III, individually and as personal representative of the Estate of J.G., a deceased minor, and Elisabeth Gray bring this civil action against Defendants for personal injuries and damages suffered by Plaintiffs and allege upon information and belief as follows:

### <u>INTRODUCTION</u>

1.      This action concerns the tragic death of J.G. at just four months old on April 17, 2022, in a Fisher-Price My Little Snugabunny Cradle Swing.

2.      J.G.'s death was shattering for his parents, siblings, and everyone else who loved this healthy, happy child. Any death of a baby is tragic beyond compare. But J.G.'s death is doubly horrific because it was the result of an unsafe and defective design for the My Little Snugabunny Cradle Swing product, which was recalled by Defendant Fisher-Price, Inc. ("Fisher-Price") on October 10, 2024, as part of a broader recall of the Snuga Swing product line.

3.      For years, Fisher-Price and its parent company, Defendant Mattel, Inc. ("Mattel"), marketed the Snuga Swing line of products as safe for infant sleep by stating that it could be used for naps. The Grays let J.G. sleep in the My Little Snugabunny Cradle Swing, and he died while doing so.

4.      Yet as part of the recall, Fisher-Price, in conjunction with the U.S. Consumer Product Safety Commission, now says the swing "should never be used for sleep" and "can increase the risk of suffocation."[1]

5.      This reversal, as shocking as it is for bereaved parents like the Grays, is the result of a 15-year pattern of gross neglect and indifference to children's safety by Defendants.

6.      The use of inclined environments like the My Little Snugabunny Cradle Swing (the surface of which, above its seat bight, is angled upward at approximately 30°) for infant sleep has contravened safety recommendations from the pediatric community since at least the early 1990s. Defendants sold it for sleep anyway.

7.      Indeed, a similar Fisher-Price product, the Rock 'n Play Sleeper, was recalled in 2019, years before J.G.'s death. Over 100 babies have died in the Rock 'n Play Sleeper. An extensive and ugly history of Fisher-Price's "fail[ure] to ensure that the Rock 'n Play was safe before bringing it to market, ignor[ing] critical warnings from pediatricians, parents, and foreign regulators that the product was dangerous, and continu[ing] to market it for overnight sleep despite clear evidence that this put infants at risk of serious harm or death" was released by the

---

[1] *See* Consumer Product Safety Commission, "Fisher-Price Recalls More than 2 Million Snuga Infant Swings Due to Suffocation Hazard After 5 Deaths Reported," October 10, 2024 (*available at* https://www.cpsc.gov/Recalls/2025/Fisher-Price-Recalls-More-than-2-Million-Snuga-Infant-Swings-Due-to-Suffocation-Hazard-After-5-Deaths-Reported).

staff of the U.S. House of Representatives Committee on Oversight and Reform in June 2021,[2] and in an associated hearing, Chairwoman Carolyn Maloney stated that Defendants' conduct was "absolutely shocking" and a "national scandal."[3]

8.     Even after the Rock 'n Play Sleeper was recalled, and after Defendants were publicly shamed for letting children die in it for years despite warning after warning, Defendants continued to market Snuga Swing products (including the My Little Snugabunny Cradle Swing) as safe for naps. They did so despite that these products are very similar to the Rock 'n Play Sleeper in its design and in its biomechanical effect on infants.

9.     According to Defendants, since 2012, there have been reports of at least five deaths involving infants one to three months of age who used Snuga Swing products for sleep. Yet Defendants ignored these safety issues—even after the recall and ban of the closely-related Rock 'n Play—and knowingly marketed and sold Snuga Swing products to consumers nationwide, including the Grays.

10.     Ultimately, Congress banned inclined sleep products in the Safe Sleep for Babies Act of 2021 ("SSBA"). The SSBA bars the sale of products with an inclined sleep surface greater than ten degrees that is intended, marketed, or designed to provide sleeping accommodations for an infant up to one year old. The My Little Snugabunny Cradle Swing meets all these criteria, making it illegal under federal law.

---

[2] *See* U.S. House of Representatives Committee on Oversight and Reform, "Infant Deaths in Inclined Sleepers: Fisher-Price's Rock 'n Play Reveals Dangerous Flaws in U.S. Product Safety," June 2021 (*available at* https://docs.house.gov/meetings/GO/GO00/20210607/112721/HHRG-117-GO00-20210607-SD007.pdf).

[3] *See* U.S. House of Representatives Committee on Oversight and Reform, "Sleeping Danger: The Rock 'n Play and Failures in Infant Product Safety," No. 117-26 (June 7, 2021) (*available at* https://www.congress.gov/event/117th-congress/house-event/LC66772/text).

11.     Since the Rock 'n Play recall, several CPSC-commissioned studies and peer-reviewed studies have been released demonstrating that inclined environments like the My Little Snugabunny Cradle Swing are unsafe for infant sleep and threaten the lives of infants who sleep in them.

12.     The recall, SSBA, and scientific developments are cold comfort for the Gray family.  In this case, they seek damages for their extreme emotional distress and for J.G.'s pain and suffering before death, the only form of recompense available to them for Defendants' actions that caused their son's death.

### PARTIES

13.     At all relevant times, Plaintiffs were and are citizens and residents, and J.G., a deceased minor, was a citizen and resident, of Hardeeville, Jasper County, South Carolina.

14.     Defendant Fisher-Price, Inc. is a corporation organized under Delaware law having its principal place of business in East Aurora, New York.

15.     Defendant Mattel, Inc. is a corporation organized under Delaware law having its principal place of business in El Segundo, California.

16.     Fisher-Price is a wholly-owned subsidiary of Mattel. Upon information and belief, a substantial portion of the acts of Fisher-Price described in this Complaint were undertaken by Fisher-Price and Mattel jointly, including that Mattel shares overall responsibility for the safety of Fisher-Price products.

17.     For example, Mattel, at all relevant times, had senior executives with control over, involvement in, and oversight of Fisher-Price, with titles such as "Executive Vice President – Fisher-Price Global Brands," and "Executive Vice President –Fisher-Price Global Brand Marketing."

18.     Defendants are jointly and severally liable for all damages alleged herein because their acts and/or omissions alleged herein are, singularly or in combination, the contributing proximate cause of Plaintiffs' damages, injuries, and losses.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is completely diversity and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

20.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims, including the sale of a My Little Snugabunny Cradle Swing to Plaintiffs and J.G.'s death in a My Little Snugabunny Cradle Swing, occurred in the District of South Carolina and pursuant to Local Civ. Rule 3.01 (D.S.C.) because, among others, a substantial part of the events alleged in this complaint occurred within the Beaufort Division.

21.     No other forum would be more convenient for the parties and witnesses to litigate this action.

## FACTS

**A.     Defendants Market the Snuga Swing For Naps**

22.     The My Little Snugabunny Cradle Swing, like the other products in the Snuga Swing product line to which the My Little Snugabunny Cradle Swing belongs, is an inclined infant swing marketed and sold by Defendants since 2010. The image of the product from the front cover of the product manual is reproduced below:



23.     The seat-back of the My Little Snugabunny Cradle Swing is inclined at approximately a 30° angle from horizontal.

24.     Defendants' marketing and labeling make consistent and unmistakable representations that the My Little Snugabunny Cradle Swing is safe for sleep for a child J.G.'s age (four months).

25.     Most fundamentally, the use of the word 'cradle' in the name My Little Snugabunny Cradle Swing indicates that the product is safe for sleep.

26.     Defendants also make affirmative representations in their video advertising on their official YouTube channel that Snuga Swing products like the My Little Snugabunny Cradle Swing are safe for sleep. These advertisements represent, among other things, that Snuga Swing products are "designed for soothing or for short naps."

27.     Further, Defendants' marketing includes clear visual representations of infants sleeping in the products on its authorized retailers' websites, including Amazon.com.

28.     Defendants could have issued a warning in the user manual cautioning against using the products for infant sleep at any time, but they instead cautioned only against using the products for prolonged periods of sleep. This limited warning further demonstrates that

Defendants knew and expected that consumers would foreseeably use the products for infant sleep, despite Defendants' knowledge of the attendant risks of such use. See the warning in the product user manual below:

Consumer Information    Información para el consumidor
Renseignements aux consommateurs

⚠️

**WARNING    ADVERTENCIA    AVERTISSEMENT**

**To prevent serious injury or death from falls and being strangled in the restraint system:**
- Always use restraint system.
- Never use with an active child who may be able to climb out of the seat.
- Never leave child unattended.
- This product is not intended to replace a crib or bassinet for prolonged periods of sleep.
- Never use the upright seat position with a child unable to hold head up unassisted.

**Para evitar lesiones graves o la muerte debido a caídas o por quedar atrapado en el sistema de sujeción:**
- Siempre utilizar el sistema de sujeción.
- No utilizar el producto con un niño que se pueda salir del asiento.
- No dejar a los niños fuera de su alcance.
- Este producto no está diseñado para reemplazar una cuna o moisés por periodos prolongados de sueño.
- No usar la posición de asiento vertical con niños que no pueden mantener la cabeza derecha por sí solos.

**Pour prévenir les blessures graves ou la mort qui pourraient survenir si l'enfant tombait ou s'étranglait avec le système de retenue :**
- Toujours utiliser le système de retenue.
- Ne jamais l'utiliser pour un enfant qui pourrait être capable de sortir seul du siège.
- Ne jamais laisser un enfant sans surveillance.
- Ce produit n'est pas conçu pour remplacer un lit d'enfant ou un berceau pour de longues périodes de sommeil.
- Ne pas utiliser le siège en position redressée si l'enfant est incapable de se tenir la tête droite sans aide.

**B.    Defendants Knew Inclined Sleep Was Unsafe For Years**

**1.    AAP Guidance**

29.    Defendants knew, or should have known, that sleep in an inclined product like the My Little Snugabunny Cradle Swing was unsafe for babies for many years before J.G. died in April 2022.

30.    The American Academy of Pediatrics ("AAP"), the nation's leading organization of pediatricians, has, since the early 1990s, made recommendations for safe infant sleep, which

have long advised that children sleep on their backs on a firm, flat surface, such as a crib or bassinet.

31.    This advice has always precluded the use of inclined sleep products, including in 2011, when the My Little Snugabunny Cradle Swing was first developed by Defendants and released by them onto the market.

32.    In 2011, the AAP reaffirmed this position when it stated in its infant sleep guidelines that infant swings should not be used for sleep and that if an infant does fall asleep in a swing, they should be moved to a flat surface as soon as possible. This advisory has reappeared in all editions of AAP guidance since, including renewed guidance published in 2016 and 2022.

33.    The AAP guidelines are widely considered authoritative, and they are published in the peer-reviewed medical journal Pediatrics and endorsed by the National Institutes of Health.

34.    On July 5, 2017, Dr. Fernando Stein, President of the AAP, submitted a public comment letter to the CPSC stating that "the AAP has concerns about all inclined sleep products and the hazards they may pose to infants, and we are concerned that a safety standard could give parents and caregivers the mistaken impression that these products have been proven safe . . . Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are also not recommended for routine sleep in the hospital or at home. Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction."

35.    On June 13, 2018, due to the proliferation of inclined sleep environments by Defendants and others, the AAP, now under President Dr. Colleen Kraft, was forced to write to the CPSC again, this time in a letter co-signed with child safety and consumer advocacy groups. This letter expressed "strong concern" about a CPSC announcement which had urged caregivers

to use restraints with inclined sleep products because the use of "inherently unsafe inclined sleep products . . . does not align with American Academy of Pediatrics safe sleep recommendations." This letter repeated the verbiage from the 2017 letter concerning the dangers of sleeping in swings.

36.    In 2022, the AAP reaffirmed the guidance set forth above and even added explicit language that surfaces on which babies sleep must be "noninclined." (*See* further discussion below.)

37.    Despite these unambiguous, repeated, and public statements from the AAP that swings and other inclined environments should not be used for sleep, Defendants continued to market the My Little Snugabunny Cradle Swing and other Snuga Swing products as safe for naps.

### 2.  Negligent Design Process

38.    In 2009, while developing the Rock 'n Play Sleeper, Defendants failed to take into account or investigate the dangers of inclined sleep. Defendants ignored the AAP guidelines; failed to undertake any scientific or medical research concerning whether it was safe for babies to sleep at an angle, despite internal safety committee recommendations to complete research to this effect; failed to consult with any pediatrician or any scientist with biomechanical expertise; and consulted with only one physician who has since lost his license to practice medicine in Texas due to practicing without a license and unsafe practices.

39.    Upon information and belief, Defendants did not do any additional research into sleeping at an angle or consult with any pediatrician or biomechanist, or any credible doctor, in the development of the Snuga Swing products, including the My Little Snugabunny Cradle Swing, beyond the grossly negligent process Defendants undertook with respect to the Rock 'n

Play. Both products having been released in 2010, the Snuga Swing would have been developed roughly contemporaneously with the Rock 'n Play Sleeper.

40.     In fact, Defendants' sale of the Snuga Swing for infant sleep was even more egregious than the "absolutely shocking" "national scandal" of its gross negligence with respect to the Rock 'n Play, in part because the AAP guidance available from at least 2011 forward explicitly warned against the use of swings for sleep.

### 3.  More Red Flags

41.     After developing the Snuga Swing and Rock 'n Play, Defendants continued to receive 'red flag' warnings concerning the dangerous nature of inclined infant sleep.

42.     In 2010, consumer product agencies in Australia (both its federal government and multiple provincial governments) warned Defendants against marketing the Rock 'n Play in Australia because of the widely-known dangers of inclined sleep.

43.     In 2011, the Canadian government barred Defendants from marketing the Rock 'n Play as a sleeper due to safety concerns, prompting them to stop selling the product in Canada.

44.     Also in 2011, the Royal College of Midwives, a widely-respected UK nonprofit, informed Defendants that the Rock 'n Play Sleeper "must not be used as an infant cot . . . because babies must always sleep flat on their backs."

45.     Throughout the 2010-2018 period, during which the Rock 'n Play Sleeper and Snuga Swing were both on the market, Defendants continuously received reports of dozens of injuries and deaths related to their inclined sleep products.

46.     This would have led any responsible company to pull these products from the market. Defendants chose to continue selling them and let babies keep dying instead.

47.     Ultimately, by the time the Rock 'n Play recall was reannounced in January 2023, approximately 100 babies had died in the Rock 'n Play alone, an astonishing figure.

48.     The Snuga Swing recall announcement, which expressly applies to the My Little Snugabunny Cradle Swing, indicates that at least five babies have died in Snuga Swing products. Plaintiffs do not know whether or not this includes their son J.G.

### 4.   Resistance to Government Inquiry and Rock 'n Play Recall

49.     By early 2018, the CPSC began to inquire about the death toll in the Rock 'n Play Sleeper.

50.     On April 6, 2018, Fisher-Price met with CPSC to explain why it believed that the Rock 'n Play was safe. In preparation for the meeting, Fisher-Price hired a consulting firm called Exponent to evaluate the safety of the Rock 'n Play from a statistical perspective and develop an analysis comparing the risk of fatality from the Rock 'n Play to the risk with other products.

51.     Exponent is a defense-side liability consultancy which specializes in representing product manufacturers when concerns are raised about the dangers of their products. For example, Exponent is best known for its work with tobacco companies attempting to dispel the notion that second-hand smoke is hazardous.

52.     Unsurprisingly, Exponent's presentation to the CPSC asserted that there was a lower risk of fatality with the Rock 'n Play than with cribs and bassinets.

53.     By extension, Exponent's analysis was meant to protect all the inclined sleep products sold by Defendants, including the Snuga Swing.

54.     Later, Robert Kaye, CPSC's Director of the Office of Compliance and Field Operations, took issue with Exponent's analysis because its statistical presentation did not make an "apples-to-apples comparison," used a small sample size, and left out the most vulnerable

infants (those under three months old). These comments were made public in the Congressional report released in June 2021.

55.     Eventually, at the CPSC's instigation, the Rock 'n Play Sleeper was recalled in April 2019.

56.     After the recall, the CPSC effectively banned inclined infant sleep products by adopting a standard for infant sleep products that required a seat back angle of no more than 10° from horizontal. *See* 84 Fed. Reg. 60949 (Supplemental Notice of Proposed Rulemaking); 86 Fed. Reg. 33022 (final rule).

57.     The recall and ban of the Rock 'n Play should have alerted Defendants of the need to remove the My Little Snugabunny Cradle Swing from the market, the product having been sold for sleep and bearing an inclined surface. Defendants did nothing, until well after it was too late for J.G.

**C.     The My Little Snugabunny Cradle Swing Is Unsafe For Naps**

58.     In 2022, the AAP released the latest update to its safe sleep guidelines, which explicitly affirmed its position that sleeping on an inclined surface is unsafe for infants.

59.     In 2022, the AAP also published its recommendations, and the basis for those recommendations, in its peer reviewed journal, PEDIATRICS. The article affirmed that sleeping on an inclined surface is unsafe for infants. *See* Moon, Rachel Y. et al., Sleep-Related Infant Deaths:  Updated 2022 Recommendations for Reducing Infant Deaths in the Sleep Environment, 150 PEDIATRICS (2022).

60.     There is substantial scientific literature regarding the inherent dangers babies experience in inclined products, including both inclined sleep products and swings.

61.     In line with AAP guidance for several decades, the CPSC released a report analyzing infant sleep products in 2019 that confirmed inclined products are not safe for infant sleep. The report, authored by a highly qualified team of engineers and clinicians, had three components: (1) an analysis of CPSC data related to infant injuries and deaths in inclined infant products; (2) a review and analysis of characteristics associated with infant sleep products available to U.S. consumers; and (3) a biomechanics study on how babies interact with inclined sleep products. The study concluded that the products subject infants to an increased risk of suffocation when compared to a safe sleep environment recommended by the AAP—i.e., a crib. The authors concluded that none of the inclined sleep products tested by the CPSC are safe for infant sleep. *See* U.S. Consumer Prod. Safety Comm'n, Biomechanical Analysis of Inclined Sleep (Dr. Erin Mannen, Sept. 18, 2019), https://www.cpsc.gov/s3fs-public/Dr-Mannen-Study-FINAL-Report-09-18-2019_Redacted.corrected_0.pdf (last visited 3/26/2025).

62.     Later, two peer reviewed studies in the highly reputable Journal of Biomechanics confirmed the CPSC's finding that inclined products should not be used for sleep. *See* Junsig Wang et al., Do Inclined Sleeping Surfaces Impact Infants' Muscle Activity and Movement? A Safe Sleep Product Design Perspective, 110 J. Biomechanics 109969 (2020), https://www.sciencedirect.com/science/article/abs/pii/S002192902030422X (last visited 3/26/2025); Junsig Wang et al., Infant Inclined Sleep Product Safety: A Model for Using Biomechanics to Explore Safe Infant Product Design, 118 J. Biomechanics 110278 (2021), https://pubmed.ncbi.nlm.nih.gov/34624615/. *See also* Siegel et al., Muscle activation and coordinated movements of infant rolling, 162 J. Biomechanics 111890 (2024), Siegel et al., Infant muscle activity is modified by inclined environments during different styles of rolling, 79 Infant Behav. Dev. 102049 (2025).

63.    In 2023, the CPSC published a report on infant seated products, including swings, and found infants placed in the product were in danger of suffocation and positional asphyxiation when face-up and face-down in the product.

64.    Upon information and belief, no peer-reviewed or otherwise authoritative published scientific literature has refuted the CPSC studies, AAP's peer-reviewed publications or recommendations, Dr. Wang's 2020 and 2021 studies, or Dr. Siegel's 2024 and 2025 studies.

65.    Moreover, a 2024 epidemiological study Sangaré et al. shows that inclined sleepers were associated with a 5-fold increased risk of SUID (sudden unexpected infant death) among infants < 12 months compared to infants in an AAP-recommended sleep environment.

66.    The My Little Snugabunny Cradle Swing's design is substantively similar to products tested in the two CPSC studies, meaning the results in those studies can be used to determine how infants would interact with the My Little Snugabunny Cradle Swing.

67.    Like the products in the CPSC studies, the My Little Snugabunny Cradle Swing subjects infants to a position when face up that is known in the biomechanical literature to inhibit normal breathing and introduces a significant risk of positional asphyxia.

68.    The similarity between the My Little Snugabunny Cradle Swing and the products tested by the CPSC, coupled with the AAP's guidance on safe sleep and Dr. Wang's and Dr. Siegel's studies, clearly demonstrate that the Snuga Swing was sold as safe for infant sleep despite substantial scientific evidence that it was inherently dangerous for sleep.

69.    Nor does it matter if the My Little Snugabunny Cradle Swing was intended for "short naps" or something other than overnight sleep because the defect, as expressed in the scientific literature, is the same whether the sleep is prolonged, a brief rest, a daytime nap, or overnight sleep.

70.     Like inclined sleepers, the design of the My Little Snugabunny Cradle Swing can lull infants into a deeper sleep than normal, making it more difficult for them to wake up if their airflow becomes obstructed.

71.     In short, the design of the My Little Snugabunny Cradle Swing creates an unreasonably dangerous biomechanical scenario that substantially increases the risk of suffocation and positional asphyxiation for infants placed in the product. This renders the product defective insofar as it is designed, marketed, and used for infant sleep.

**D.     The SSBA**

72.     The Safe Sleep for Babies Act, Pub. L. 117-126, states that "inclined sleepers for infants" constitute a "banned hazardous product under Section 8 of the Consumer Product Safety Act." It became law in May 2022.

73.     A "banned hazardous product" under Section 8 of the Consumer Product Safety Act is one which "presents an unreasonable risk of injury" from which "no feasible consumer product safety standard . . . would adequately protect the public . . . ."

74.     Under the SSBA, an "inclined sleeper for infants" is defined to mean a "product with an inclined sleep surface greater than ten degrees that is intended, marketed, or designed to provide sleeping accommodations for an infant up to 1 year old."

75.     The My Little Snugabunny Cradle Swing in which J.G. died has an inclined sleep surface greater than ten degrees and was intended and marketed to provide a sleeping accommodation for an infant of J.G.'s age, i.e., four months old.

76.     The My Little Snugabunny Cradle Swing thus, by operation of federal law, "presents an unreasonable risk of injury" from which "no feasible consumer product safety standard . . . would adequately protect the public . . . ."

77.     The My Little Snugabunny Cradle Swing would be defective without the SSBA, but the SSBA makes it defective by operation of law, since a product which presents an unreasonable risk of injury is defective under applicable law.

**E.     J.G. Dies Because Of The Snuga Swing's Defect**

78.     Plaintiff John Gray III purchased a Fisher-Price My Little Snugabunny Cradle Swing, Product No. V0099, from a retail store in early 2022.

79.     John Gray III purchased the My Little Snugabunny Cradle Swing in large part because he wanted a place for J.G. to take naps during the day in comfort and safety.

80.     At the time of purchase, John Gray III believed the My Little Snugabunny Cradle Swing was an appropriate environment for infant naps because it was marketed as such by Defendants, including in its very name. Plaintiffs continued to believe this and act on this belief.

81.     After John Gray III purchased the My Little Snugabunny Cradle Swing, Plaintiffs used it frequently for J.G.'s daytime naps.

82.     On April 17, 2022, J.G. fell asleep in John Gray III's lap while the two were relaxing in the family's living room. John Gray III transferred J.G. into the My Little Snugabunny Cradle Swing for a nap.

83.     John Gray III did not leave the room, but because he believed the My Little Snugabunny Cradle Swing was a safe place for J.G. to nap, he diverted his attention to a video game and then a TV program for about 30 to 40 total minutes, at which time he checked on J.G.

84.     When John Gray III checked on J.G., he was shocked to discover that J.G. was not breathing.

85.     John Gray III panicked, attempted CPR, and called his mother, who lived nearby. When his mother arrived, she called 911 and also called in another family member from nearby who is a nurse.

86.     When paramedics arrived, they continued to attempt to revive J.G., but they were unable to do so. He passed away there in the family's living room.

87.     J.G. died as a result of the My Little Snugabunny Cradle Swing's defective design.

**F.  Snuga Swing Recall**

88.     On October 10, 2024, Defendants announced the recall of their Snuga Swing products, including the My Little Snugabunny Cradle Swing.

89.     The recall announcement states that the product "should never be used for sleep," despite that that is exactly what Defendants marketed it for, and its very name indicates it can be used for sleep.

90.     The Snuga Swing recall came too late to save the life of J.G., who died in 2022, well before it was issued. Defendants never communicated to the Grays that the My Little Snugabunny Cradle Swing should not be used for sleep—they communicated the exact opposite: that it could and should be used for naps.

<u>**CAUSES OF ACTION**</u>

**Count I**

**Strict Liability – Defective Design**

91.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

92.    At all times material herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting the My Little Snugabunny Cradle Swing and placed the My Little Snugabunny Cradle Swing into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

93.    Defendants, as manufacturers, designers, distributors, and marketers of children's products, had a duty to design a product free from a defective condition that was unreasonably dangerous to Plaintiffs' infant son.

94.    The My Little Snugabunny Cradle Swing was designed in a way that is unsafe for infant sleep, and as such it posed an unreasonable risk of infant death. Defendants placed and kept the My Little Snugabunny Cradle Swing on the market despite its defective condition.

95.    Further, the My Little Snugabunny Cradle Swing is unreasonably dangerous, in a way that cannot be remedied by any safety standard, by operation of the Safe Sleep for Babies Act, as set forth above.

96.    The My Little Snugabunny Cradle Swing's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiffs expected.

97.    The intended or actual utility of the My Little Snugabunny Cradle Swing is not of such benefit to justify the risk of infant death, thereby rendering the product unreasonably dangerous.

98.    Defendants knew or should have known through testing, generally accepted scientific knowledge, advances in the field, published research in major peer-reviewed journals,

or other means, that the My Little Snugabunny Cradle Swing created an unreasonable risk of infant death when used for sleep at the time of the product's design, manufacture, assembly, marketing, and sale.

99.    The defective condition of the My Little Snugabunny Cradle Swing manufactured and sold by Defendants and used by Plaintiffs caused the death of their infant son J.G.

100.    Plaintiffs' use of the My Little Snugabunny Cradle Swing was normal, intended, and foreseeable. Defendants sold, marketed, and distributed a product, the My Little Snugabunny Cradle Swing, which was unreasonably dangerous for this normal, intended, and foreseeable use.

101.    Defendants knew or should have known that children, J.G. specifically, would foreseeably and needlessly suffer injury as a result of the My Little Snugabunny Cradle Swing's defective design.

102.    The My Little Snugabunny Cradle Swing is defective and unreasonably dangerous to J.G. and other child users even if Defendants had exercised all possible care in the preparation and sale of the product.

103.    Plaintiffs are ordinary consumers and would not expect an infant swing designed, marketed, and labeled for infant sleep to cause their child to die.

104.    As a direct and proximate result of Defendants' conduct and defective design, including inadequate testing and research, and the defective and dangerous nature of the My Little Snugabunny Cradle Swing, J.G. suffered bodily injuries that resulted in pain and suffering before death and then his death, and his parents as a result suffered disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses on account of J.G.'s

wrongful death. The losses are either permanent or continuing, and Plaintiffs will suffer losses in the future.

105.    Defendants are strictly liable for Plaintiffs' injuries, including those of J.G.

## Count II

## Strict Liability – Failure to Warn

106.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

107.    At all times material herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting the My Little Snugabunny Cradle Swing and placed the My Little Snugabunny Cradle Swing into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

108.    Defendants, as manufacturers, designers, distributors, and marketers of children's products, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known based on information that was available and generally accepted in the scientific community that warnings and other relevant information and data which they distributed regarding the risks associated with the My Little Snugabunny Cradle Swing were inadequate.

109.    Plaintiffs did not have the same knowledge as Defendants and had no adequate warning or other relevant information or data was communicated to Plaintiffs.

110.    Defendants knew or should have known that, without an adequate warning communicated to Plaintiffs, Plaintiffs could not have realized the dangerous condition of the My Little Snugabunny Cradle Swing.

111.    Defendants had and continue to have a duty to provide adequate warnings and instructions for the My Little Snugabunny Cradle Swing, not to design a product that is unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

112.    Defendants had and continue to have a duty to provide consumers, including Plaintiffs, with warnings and other relevant information and data generally accepted in the scientific community regarding the risks and dangers associated with the My Little Snugabunny Cradle Swing, as it became or could have become available to Defendants.

113.    Defendants marketed, promoted, distributed, and sold an unreasonably dangerous and defective product, the My Little Snugabunny Cradle Swing, to consumers, including Plaintiffs, without adequate warnings or other relevant information and data regarding the risk of infant death which was available and generally accepted within the scientific community. Through both omissions and affirmative misstatements, Defendants misled Plaintiffs about the risks and benefits of the My Little Snugabunny Cradle Swing, which resulted in J.G.'s injury and death.

114.    Defendants knew or should have known through testing, scientific knowledge, advances in the field, published research in major peer-reviewed journals, or otherwise, that the My Little Snugabunny Cradle Swing created a risk of infant death. At all relevant times, such information was readily available and generally accepted within the scientific community.

115.    Despite that Defendants knew or should have known based on information available to them that the My Little Snugabunny Cradle Swing presented an unreasonable risk of

infant death, they continued to promote and market the My Little Snugabunny Cradle Swing without providing adequate information and data or recommending that it not be used for sleep.

116.    Defendants knew or should have known that consumers, and J.G. specifically, would foreseeably and needlessly suffer injury and death as a result of Defendants' failures.

117.    The My Little Snugabunny Cradle Swing supplied to Plaintiffs by Defendants was, at the time it was used by Plaintiffs, in essentially the same condition as when it left the hands of Defendants.

118.    The My Little Snugabunny Cradle Swing supplied to Plaintiffs by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold, and Defendants also acquired additional knowledge and information confirming the defective and unreasonably dangerous nature of the My Little Snugabunny Cradle Swing. Despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that the My Little Snugabunny Cradle Swing bears an elevated risk of infant death when used for sleep.

119.    Defendants' failure to provide adequate warnings or instructions rendered the My Little Snugabunny Cradle Swing unreasonably dangerous in that it failed to perform as safely as an ordinary consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants and in that the risk of danger outweighs the benefits.

120.    Defendants failed to provide timely and adequate warnings to consumers, including Plaintiffs.

121.    Plaintiffs would not have used the My Little Snugabunny Cradle Swing for sleep had they been apprised by Defendants of the unreasonably high risk of infant death associated with use of the My Little Snugabunny Cradle Swing for sleep.

122.     Defendants also failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risk of infant death from sleep in the My Little Snugabunny Cradle Swing.

123.     Defendants continued to promote and sell the My Little Snugabunny Cradle Swing even after they knew or should have known of the unreasonable risk of infant death caused by use of the My Little Snugabunny Cradle Swing for sleep.

124.     Defendants had an obligation to provide Plaintiffs with adequate relevant information and data and warnings regarding the risks associated with use of the My Little Snugabunny Cradle Swing for sleep and/or that there existed safer and more or equally effective alternative sleep environments for infants.

125.     By failing to adequately test and research harms associated with the My Little Snugabunny Cradle Swing and by failing to provide appropriate warnings and instructions about the use of the My Little Snugabunny Cradle Swing for sleep, Defendants inadequately informed consumers about the true risk-benefit profile of the My Little Snugabunny Cradle Swing and did not make consumers sufficiently aware that infant death could result from the use of the My Little Snugabunny Cradle Swing for sleep.

126.     The My Little Snugabunny Cradle Swing designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings because even after Defendants knew or should have known of the risk of infant death from using the My Little Snugabunny Cradle Swing for sleep, Defendants failed to provide adequate warnings to users or consumers of the product and continued to improperly advertise, market, and/or promote the My Little Snugabunny Cradle Swing.

127. The foreseeable risk of infant death caused by use of the My Little Snugabunny Cradle Swing for sleep could have been reduced or avoided if Defendants had provided reasonable instructions or warnings of this foreseeable risk of harm.

128. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, defective design, inadequate testing and research, and the defective and dangerous nature of the My Little Snugabunny Cradle Swing, J.G. suffered bodily injuries that resulted in pain and suffering before death and then his death, and his parents as a result suffered disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses on account of J.G.'s wrongful death. The losses are either permanent or continuing, and Plaintiffs will suffer losses in the future.

129. Defendants are strictly liable for Plaintiffs' injuries, including those of J.G.

## Count III

## Negligence

130. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

131. At all times relevant herein, it was the duty of Defendants to use reasonable care in the design, labeling, manufacturing, testing, marketing, distribution, and/or sale of the My Little Snugabunny Cradle Swing.

132. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution, and/or sale of the My Little Snugabunny Cradle Swing in that Defendants knew or should have known that the My Little Snugabunny Cradle Swing created an unreasonably high risk of infant death.

133.    Defendants breached their duty of care to Plaintiffs and their son J.G. in the labeling, design, manufacturing, testing, marketing, distribution, and/or sale of the My Little Snugabunny Cradle Swing.

134.    In disregard of their duty, Defendants committed one or more of the following negligent acts or omissions:

a.    Failing to adequately research or test the biomechanical effect of the My Little Snugabunny Cradle Swing on infants;

b.    Disregarding or failing to take account of any or all of the following, each of which indicated that the My Little Snugabunny Cradle Swing was unsafe for sleep:

   i.    AAP safe sleep guidelines;

   ii.    the AAP's public statements;

   iii.    CPSC-commissioned inclined sleep studies;

   iv.    peer-reviewed research;

   v.    advisories from Canadian and Australian regulators and the Royal College of Midwives pertaining to inclined sleep;

   vi.    the CPSC's ban on inclined sleepers;

   vii.    reports of injuries and deaths in Snuga Swing products, including but not limited to the My Little Snugabunny Cradle Swing;

   viii.    reports of injuries and deaths in the Rock 'n Play Sleeper or other inclined infant sleep products or other products with equivalent or similar biomechanical effects to the My Little Snugabunny Cradle Swing;

> ix.   the SSBA, as it was being considered and advanced in Congress before J.G. died;

   c.   Failing to recall the My Little Snugabunny Cradle Swing before J.G. died;

   d.   Failing to adequately label the My Little Snugabunny Cradle Swing as unsafe for sleep;

   e.   Failing to adequately warn consumers that the My Little Snugabunny Cradle Swing was unsafe for sleep;

   f.   Failing to make a public statement that the My Little Snugabunny Cradle Swing should not be used for sleep before J.G. died;

   g.   Commissioning the misleading Exponent study to attempt to justify inclined sleep products instead of taking them off the market;

   h.   Selling the My Little Snugabunny Cradle Swing as a product safe to use for sleep;

   i.   Other negligent acts or omissions not yet known to Plaintiffs.

135.   A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

136.   As a direct and proximate result of Defendants' negligent acts and omissions, they introduced a product that they knew or should have known would cause infants to die. As a result, J.G. suffered bodily injuries that resulted in pain and suffering before death and then his death, and his parents suffered disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses on account of J.G.'s wrongful death. The losses are either permanent or continuing, and Plaintiffs will suffer losses in the future.

**Count IV**

**Breach of Express Warranty**

137.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

138.    At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting the My Little Snugabunny Cradle Swing and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

139.    Defendants expressly warranted to Plaintiffs, in the product manual and warnings, publications, labeling, the internet, and other communications intended for the general public, that the My Little Snugabunny Cradle Swing was safe, effective, fit, and proper for its intended uses, including infant sleep.

140.    The My Little Snugabunny Cradle Swing materially failed to conform to those representations made by Defendants. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiffs concerning the My Little Snugabunny Cradle Swing as sold to Plaintiffs.

141.    Defendants expressly warranted that the My Little Snugabunny Cradle Swing was safe for sleep. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that the My Little Snugabunny Cradle Swing created an unreasonably high risk of infant death when used for sleep. Defendants knew or should have known that the My Little Snugabunny Cradle Swing was dangerous to the well-being of J.G. and others.

142.    The My Little Snugabunny Cradle Swing does not conform to Defendants' representations because it is defective, is not safe, and carries an unreasonably high risk of infant death when used for sleep.

143.    Plaintiffs justifiably relied on Defendants' representations regarding the safety of the My Little Snugabunny Cradle Swing, and Defendants' representations became part of the basis of the bargain.

144.    Plaintiffs justifiably relied on Defendants' representations regarding the safety of the My Little Snugabunny Cradle Swing in their decision to use the product as a sleep environment for their son J.G.

145.    Plaintiffs justifiably relied on Defendants' representations regarding the safety of the My Little Snugabunny Cradle Swing in deciding to use it over other alternative sleep environments on the market, and Plaintiffs justifiably relied on Defendants' representations in deciding to purchase and use the product.

146.    Plaintiffs purchased and used the My Little Snugabunny Cradle Swing without knowing that the product is not safe for sleep but instead creates an unreasonably high risk of infant death when used for sleep.

147.    As a direct and proximate result of the Defendants' breach of express warranty, they introduced a product they knew or should have known would cause infants to die. As a result, J.G. suffered bodily injuries that resulted in pain and suffering before death and then his death, and his parents suffered disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses on account of J.G.'s wrongful death. The losses are either permanent or continuing, and Plaintiffs will suffer losses in the future.

**Count V**

**Breach of Implied Warranty**

148.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

149.     At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting the My Little Snugabunny Cradle Swing and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

150.     Defendants were the sellers of the My Little Snugabunny Cradle Swing and sold the My Little Snugabunny Cradle Swing to be used for sleep, among other purposes. Plaintiffs purchased and used the My Little Snugabunny Cradle Swing for these intended purposes.

151.     When the My Little Snugabunny Cradle Swing was used by Plaintiffs, the product was being used for the ordinary purpose for which it was intended.

152.     Defendants impliedly warranted that their My Little Snugabunny Cradle Swing product, which they manufactured, distributed, and/or sold, and which Plaintiffs purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

153.     Defendants breached their implied warranties as to the My Little Snugabunny Cradle Swing product because the My Little Snugabunny Cradle Swing sold to Plaintiffs was not fit for its ordinary purpose as a sleep environment for infant naps, among other uses.

154.     The My Little Snugabunny Cradle Swing would not pass without objection in the trade; is not of fair average quality; is not fit for the ordinary purposes for which the product is

used; was not adequately contained, packaged, and labeled; and fails to conform to the promises or affirmations of fact made on the container or label.

155.    Defendants' breach of their implied warranties resulted in John Gray III placing J.G. in the My Little Snugabunny Cradle Swing for a nap on April 17, 2022, which caused J.G.'s death.

156.    As a direct and proximate result of Defendants' breach of implied warranty, they introduced a product that they knew or should have known would cause infants to die. As a result, J.G. suffered bodily injuries that resulted in pain and suffering before death and then his death, and his parents suffered disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses on account of J.G.'s wrongful death. The losses are either permanent or continuing, and Plaintiffs will suffer losses in the future.

**Count VI**

**Negligent Infliction of Emotional Distress**

157.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

158.    As set forth above, the negligence of Defendants caused serious physical injury and death to another, namely J.G.

159.    Plaintiff John Gray III was in close proximity to the accident, i.e., J.G.'s death in the My Little Snugabunny Cradle Swing. He was a few feet away in the same room.

160.    Plaintiff John Gray III is closely related to the victim J.G., as his father.

161.    John Gray III contemporaneously perceived J.G.'s accidental death.

162.    John Gray III has experienced emotional distress which has manifested itself by physical symptoms capable of objective diagnosis, which can and will be established by expert testimony at the appropriate time in this litigation.

163.    As a direct and proximate result of Defendants' negligent acts and omissions and his contemporaneous perception of J.G.'s accidental death, John Gray III suffered disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses on account of J.G.'s wrongful death. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

## Count VII

### Survival Action - S.C. Code Ann. § 15-51-10

164.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

165.    Due to Defendants' conduct alleged herein, J.G. suffered injury and damages caused by Defendants' actionable conduct, which include, but are not limited to pain, suffering, mental distress, and premature death.

166.    J.G.'s causes of action for his injuries and damages survive his death and pass to his Estate.

## Count VIII

### Wrongful Death Action - S.C. Code Ann. § 15-51-20

167.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

168.    As set forth above, as a direct result of Defendants' actionable conduct alleged herein, J.G. met an untimely death, by virtue of which his statutory beneficiaries have lost his aid, comfort, companionship, support, and society, and have suffered emotional distress, anxiety, grief, and sorrow, for which Plaintiffs are entitled to recover damages on behalf of the statutory beneficiaries pursuant to S.C. Code § 15-51-10 et seq., in an amount to be determined by the jury in the trial of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

1.    Award Plaintiffs compensatory damages in excess of the jurisdictional minimum of this Court and in an amount to be determined at trial, including, but not limited to:

   a.    General Damages for severe physical pain, mental suffering, disability, emotional distress, inconvenience, and loss of the enjoyment of life; and

   b.    Special Damages, including all expenses, incidental past and future expenses, past and future medical expenses, and loss of earnings and earning capacity,

both for J.G. on account of his pain and suffering before death, and for Plaintiffs, his parents, on account of the harm inflicted on them by J.G.'s wrongful death as a result of Defendants' acts and omissions.

2.    Award punitive damages in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future to the extent Defendants' conduct, as described above, exhibited willful disregard and/or absence of due care and/or recklessness and/or gross negligence and/or malice;

3.    Award interest as permitted by law;

4.    Award reasonable attorneys' fees and costs, as provided for by law; and

5.    Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all Counts and as to all issues so triable.

Dated: April 14, 2025

s/*Caleb M. Hodge*
Elizabeth Middleton Burke (SCBN 13610; Fed. ID # 7466)
Caleb M. Hodge (SCBN 104874; Fed. ID #13465)
**Rogers Patrick Westbrook & Brickman, LLC**
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
(843) 727-6500 Telephone
(843) 216-6509 Facsimile
bburke@rpwb.com
chodge@rpwb.com

Jonathan A. Sorkowitz (*pro hac vice* to be requested)
**Law Offices of Jonathan A. Sorkowitz**
480 Bedford Road, Suite 3201
Chappaqua, NY 10514
(646) 493-9636 Telephone
(914) 639-9004 Facsimile
jsorkowitz@sorkowitzlaw.com

Leonard W. Aragon (*pro hac vice* to be requested)
**Hagens Berman Sobol Shapiro LLP**
11 W. Jefferson St. #1000
Phoenix, AZ 85003
(602) 849-5900 Telephone
(602) 840-3012 Facsimile
leonarda@hbsslaw.com

David A. Peck (*pro hac vice* to be requested)
Aran J. Wong (*pro hac vice* to be requested)
**Coast Law Group LLP**
1140 S. Coast Hwy. 101
Encinitas, CA 92024
(760) 670-4554 Telephone
dave@coastlawgroup.com
aran@coastlawgroup.com

***Attorneys for Plaintiffs***